ROBIA HOLDING CORPORATION, Appellant, *v.* JAMES J. WALKER, as Mayor of the City of New York, and Others, Respondents.*

First Department, November 21, 1930.

*Louis J. Altkrug* of counsel [*Louis B. Eppstein* with him on the brief; *Eppstein & Hirshfield*, attorneys], for the appellant.

*William E. C. Mayer* of counsel [*J. Joseph Lilly* with him on the brief; *Arthur J. W. Hilly, Corporation Counsel*], for the respondents.

* Affg. 136 Misc. 358.

SHERMAN, J. This is a taxpayer's action, seeking judgment that the municipal legislation authorizing the construction of the Triborough bridge over the Harlem river and East river, between the boroughs of Manhattan, Bronx and Queens, and the vehicular tunnel under New York bay connecting the boroughs of Brooklyn and Richmond, as well as the " Mid-Manhattan " vehicular tunnel between the boroughs of Manhattan, Brooklyn and Queens be declared void, and that their construction be restrained. The ground of this attack upon the local legislation providing for such improvements is that the city of New York is without power to collect tolls from the use of such improvements and, therefore, may not issue corporate securities out of the proceeds of which such improvements are to be constructed, because of the limitation in the city's charter forbidding the issuance of such securities, except where the improvement is to be revenue producing. If these proposed improvements be not revenue producing, they may not now be constructed at all. Manifestly, the only way to make them self-supporting is by charging a toll for their use. Upon motion, the complaint was dismissed as insufficient at Special Term, and this appeal tests the correctness of that determination.

Under chapter 466 of the Laws of 1901, as amended by chapter 615 of the Laws of 1916, the Greater New York Charter, section 47, gave to the board of aldermen the power to provide for the building of bridges and tunnels, and for such purposes to create loans and authorize the issue of bonds or other evidences of indebtedness, limited by the provisions of section 169 of that act, as amended by chapter 615 of the Laws of 1916, which prescribes that such improvements, for which corporate stock or serial bonds may be issued, shall be revenue producing.

By the adoption of the home rule amendments to the Constitution (Art. 12, as amd. in 1923) and the enactment of the City Home Rule Law (Laws of 1924, chap. 363, § 11, as amd. by Laws of 1928, chaps. 668, 670, and Laws of 1929, chap. 646), the powers of the city have been widened, so that the municipal legislative body has the power to adopt and amend local laws in relation to the property, affairs or government of the city, including the transaction of its business, the incurring of its obligations, the acquisition, care, management and use of its streets and property, and in other respects.

Under the limitations of section 169 of the Greater New York Charter, bridges and tunnels can be constructed out of the proceeds derived from the sale of municipal securities, and they must be

" revenue-producing " as defined in subdivision 9 of said section, which likewise enacts that the proposed improvement at the time of authorization of the expenditure shall be determined by the board of estimate and apportionment to have " a substantial present or prospective earning power."

When the board of estimate and apportionment authorized on March 15, 1929, an appropriation of $3,000,000 for the preparation of plans for, and construction of, the Triborough bridge, it expressly determined that improvement to have a substantial present or prospective earning power, and the ordinance of the board of aldermen approving the expenditure likewise so found. This initial resolution of the board of estimate and apportionment also contains the determination by the board that the proposed improvements are to be constructed as " revenue-producing." Local Laws No. 3 and No. 8 of 1929 were thereupon passed by the municipal assembly and provide for the fixing of tolls for the use of the bridge and the two vehicular tunnels, out of the proceeds of which a sinking fund is to be erected to meet the payment of interest upon, and amortization and retirement of, such corporate stock or serial bonds as may be issued from time to time to pay for the construction and equipment of these improvements. All of these improvements are so tied together in the resolutions and acts of the municipal authorities that they are alike affected by this suit. No one project may survive as valid if the others be declared illegal. All must meet the same fate. If these resolutions and acts have received legislative ratification, though in different enactments, their validity, of course, becomes unquestionable.

Local Law No. 3 of 1929, passed March 26, 1929, and approved by the mayor on April 3, 1929, was filed on April 5, 1929, in the office of the Secretary of State, as required by section 22* of the City Home Rule Law. It was accepted as a valid exercise of the municipal legislative power by the contemporaneous enactment (upon an emergency message from the Governor) of chapter 379 of the Laws of 1929 which, upon signature by the Governor, became a law on April 9, 1929. The Legislature by that enactment released and surrendered to the city of New York a strip of land on Ward's island for the express purpose of thereon erecting piers and abutments to support the bridge. It must be deemed that the Legislature acted with full knowledge of that local law. It is sometimes competent to refer to the circumstances under which, and the purpose for which, a statute is passed. (*People ex rel. Savings Bank* v. *Butler*, 147 N. Y. 164, 169.) " Statutes enacted at the same session of the Legislature should receive a construction,

---

* Amd. by Laws of 1928, chap. 673, and Laws of 1929, chap. 37.

if possible, which will give effect to each. They are within the reason of the rule governing the construction of statutes in *pari materia.*" (*Smith* v. *People*, 47 N. Y. 330, 339.) The Legislature having in mind the existence of that local law fully intended that the State legislation upon the same subject-matter should harmonize therewith and aid in effecting its purpose. (Lewis' Sutherland Stat. Const. [2d ed.] §§ 447, 448.)

The local legislation under consideration received further approval from the Legislature by the enactment of chapter 373 of the Laws of 1930, expressly ratifying the construction and equipment of the tunnels out of the proceeds of bonds payable out of tolls to be collected. Moreover, the Legislature, upon a further emergency measure from the Governor (Laws of 1930, chap. 437), amended chapter 379 of the Laws of 1929 by declaring therein the bridge which is to occupy the property on Ward's island, ceded in the prior enactment, to be a " municipal toll " bridge.

Appellant does not attack the constitutionality of chapter 379 of the Laws of 1929, but claims that both chapter 373 of the Laws of 1930 and chapter 437 of the Laws of 1930 are unconstitutional. It is said that they violate article 3, section 16, of the Constitution, which provides: " No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title."

Chapter 373 of the Laws of 1930 is entitled, " An Act to amend the Public Service Commission Law, in relation to the powers and duties of the board of transportation." It is not a private or local bill but a general act, amending a general law.

The title of chapter 437 of the Laws of 1930 (a local act) is " An Act to amend chapter three hundred and seventy-nine of the laws of nineteen hundred and twenty-nine, entitled ' An act to authorize the Land Board to release and surrender to the city of New York a part of the premises, with structures thereon, demised by the lease of Ward's Island made by the city of New York to the State of New York,' in relation to the type of bridge to be constructed." Thus, in the title, it is described as amending the prior act of 1929 in relation to " the type of bridge to be constructed." We are told that we must narrow these words and construe them as relating to the physical type of bridge to be constructed, and thereby invalidate the legislation. But the word " physical " does not appear in the title and may not be read into it. A toll bridge is a recognized " type " of bridge in contradistinction to a free bridge. The test as to whether the title of an act satisfies the requirement of the Constitution is laid down in *Economic P. & C. Co.* v. *City of Buffalo* (195 N. Y. 286, 297):

" The most valuable test of such a title, and the one which we have usually employed, is the inquiry whether the title was so framed as to be deceptive or misleading, and consummated the evil at which the constitutional prohibition was aimed. Where one reading a proposed bill with the title in his mind comes upon provisions which take him by surprise, which he could not reasonably have anticipated, and so both citizen and legislator are misled and thrown off their guard, it is our duty to declare the condemnation of the fundamental law. * * * Its purpose is to prevent fraud and deception by concealment, in the body of acts, subjects not by their titles disclosed to the general public and to legislators, who may rely upon them for information as to pending legislation. When the subject is expressed, all matters fairly and reasonably connected with it, and all measures which will or may facilitate its accomplishment, are proper to be incorporated in the act and are germane to the title. The title must be such at least as fairly to suggest or to give a clue to the subject dealt with in the act, and unless it comes up to this standard, it falls below the constitutional requirement."

Tested by these rules and measured by the language of article 3, section 16, of the Constitution, we hold that the content of chapter 437 of the Laws of 1930 is sufficiently expressed in the title, and that the enactment does not embrace more than one subject.

Not only had the city the toll-fixing power to provide for the construction of revenue-producing public improvements, such as bridges and tunnels, but the exercise of such power in the present instance has been ratified and confirmed by the Legislature.

The order and judgment appealed from should be affirmed, with costs.

MERRELL and McAVOY, JJ., concur; DOWLING, P. J., and FINCH, J., dissent.

FINCH, J. (dissenting). From an order and judgment dismissing the complaint for failing to state facts sufficient to constitute a cause of action, the plaintiff appeals.

The action is brought by a taxpayer. A judgment is sought declaring unconstitutional a resolution of the board of estimate and apportionment passed on the 15th day of March, 1929, and Local Laws 3 and 8 of the city of New York for the year 1929. The question involved is the power of the city to charge tolls for the use by the public of the Triborough bridge and two vehicular tunnels, one from mid-town Manhattan to Brooklyn and the other from Brooklyn to Staten Island, which were provided by said resolution and enactments.

The city of New York, having adopted a plan of rapid transit improvement involving the construction of a bridge connecting the boroughs of Manhattan, Bronx and Queens and of a vehicular tunnel between the boroughs of Brooklyn and Richmond, and having found that the constitutional limitation of indebtedness impeded the financing thereof, sought to avoid this limitation by making the improvements revenue producing. Accordingly the board of estimate and apportionment passed the aforesaid resolution, providing, among other things, that the Triborough bridge and vehicular tunnel should be subject to tolls, and thus revenue-producing public improvements. The resolution further provided for the issuance of corporate stock or serial bonds of the city of New York for the purpose of providing the necessary funds, and for the introduction in the municipal assembly of the city of New York of a local law providing for the imposition and collection of rates and tolls for the use of said bridge and tunnel. Pursuant to this resolution, Local Law No. 3 for the year 1929 was enacted, authorizing the board of estimate and apportionment to establish charges and tolls necessary and convenient to insure sufficient revenue to meet the expense and construction of said Triborough bridge and vehicular tunnel and to make provision for the payment of interest upon and amortization of such corporate stock or serial bonds of the city of New York as might from time to time be issued for such purposes. Local Law No. 8 of 1929 amended said Local Law No. 3, adding thereto a provision for a "Mid-Manhattan and East River vehicular tunnel between the Boroughs of Manhattan, Brookyln and Queens."

On June 27, 1929, the board of estimate and apportionment adopted a resolution authorizing the issuance of corporate stock of the city of New York, as provided by section 169 of the Greater New York Charter, in an amount not exceeding $3,000,000, the proceeds to be used for the preparation of plans and to initiate the construction of said Triborough bridge, which improvement, it was recited in the resolution, "the Board of Estimate and Apportionment hereby determines to have substantial present or prospective earning power."

The plaintiff claims that the city was without any authority to establish tolls for the use by the public of bridges and tunnels, and, therefore, that the enactments in question are void. The learned court at Special Term held that the Legislature had delegated to the city the power to exact tolls for the use by the public of bridges and tunnels constructed by the city, and, accordingly, held the complaint insufficient. In our opinion the city must still obtain from the Legislature the authorization necessary to

levy tolls and, without such authorization, is without power to levy such tolls, for the following reasons:

Clearly the Legislature has not expressly and specifically authorized the collection of tolls in connection with these particular improvements. In its place has there been a sufficient general delegation of such power? None such has been found. It is urged by the respondent that such authority is to be implied from a series of legislative enactments, *i. e.*, the provision of section 242* of the Greater New York Charter, placing with the board of estimate and apportionment the control of all bridges and tunnels, coupled with the provisions of subdivision 9 of section 11 of the General City Law (Cons. Laws, chap. 21; Laws of 1909, chap. 26) granting to the city the power to establish, construct, maintain, operate, alter and discontinue bridges, tunnels and ferries and approaches thereto, and also the home rule amendment to the Constitution (Art. XII), section 3 of which provides: "Every city shall have power to adopt and amend local laws not inconsistent with the Constitution and laws of the State, relating to * * * the transaction of its business, the incurring of its obligations, * * * the acquisition, care, management and use of its streets and property, * * * and the government and regulation of the conduct of its inhabitants and the protection of their property, safety and health."

Reliance further is placed upon section 169 of the Greater New York Charter, which limits the expenditure of the proceeds of sale of corporate stock or serial bonds to "revenue-producing improvements."

Assuming it is the fact that the right to lay and collect tolls is a sovereign prerogative of the State and cannot be exercised by any individual or corporation, whether municipal or private, without unequivocal authority from the Legislature, and that prior to the passage of the home rule amendment to the Constitution, the city of New York had obtained from the Legislature authority to lay and collect tolls for one bridge only, the New York and Brooklyn bridge, it is clear that none of the above enactments in general terms gives the right generally to the city of New York to lay and collect tolls. Not only has judicial authority reiterated again and again that this right to levy tolls, if found to exist, must be based upon unequivocal authority (Dillon Mun. Corp. [5th ed.] § 1158; 1 Elliott Roads & Streets [4th ed.], § 46; *Breathitt County* v. *Hammonds*, 150 Ky. 502), but also as a practical matter bridges and tunnels are a part of the comprehensive highways system of the State and are held in trust for all the people (*Matter of McCoy* v. *Apgar*, 241 N. Y. 71), and the right to collect tolls upon highways,

* Added by Local Laws of 1925, No. 3.

of which these bridges and tunnels are a part, must be held to belong to the State except in exceptional circumstances which permit of the legislative grant to the local subdivision. Otherwise the right of highway travel would become seriously impaired, if not intolerable.

Nor do the home rule amendments to the Constitution of the State of New York and the City Home Rule Law change the situation in the slightest. The city of New York still remains under the same disability to lay and collect tolls for the use of the public improvements referred to in this case, since unequivocal authority to levy tolls has not been obtained from the Legislature. As was said by Judge CARDOZO in *Browne* v. *City of New York* (241 N. Y. 96, 123–125), where the authority of municipal corporations under the home rule amendments is defined: "If the act of 1924 (the City Home Rule Law) was framed in the belief that cities would have the power thereafter to become common carriers of passengers, its provisions are more significant for what they omit than for what they contain. The subject of municipal transportation had long agitated the public mind, and never more than then. We have seen that as the result of injunctions against the operation of municipal bus lines which had been granted by the courts, repeated applications had been made to the Legislature in behalf of the city of New York to enlarge the city's power and that all bills directed to that end had been rejected. We are now told that the same Legislature was granting with one hand what it was withholding with the other. The indefinite statement that cities might regulate the acquisition, care, management and use of their streets and property, neutralized, it is said, the failure to make explicit grant of the power so clamorously demanded and steadily refused. A decent respect for a co-ordinate department of the government forbids the judiciary to assume that the lawmakers, intending to confer the power, would have so mystified the grant. In this State, even if not elsewhere, municipal transportation upon a scale so extensive without supervision or restriction is a notable innovation. The colorless words chosen were singularly inept if they were intended to express approval of a departure so momentous. We cannot reasonably invest them with this meaning when they may be given a legitimate function within the range of established and familiar powers. A phrase so unobtrusive, so commonplace in the vocabulary of Legislatures, so freighted with other traditions, with other associations and suggestions, will not bear so great a burden. Charters, almost without number, have confided to local legislative bodies an ordinance power which

embraces the regulation of the use of streets, if not in so many words, at least in words substantially equivalent. We assume for present purposes, though without intending to decide, that by force of such a grant there is power to regulate the burdens to which the streets shall be subjected, as unquestionably there is power to place reasonable regulations upon traffic, its methods, forms or hours. Only recently we sustained a statute whereby a municipality was given power to license the erection of gasoline pumps along the curbs of streets, for the convenience of its travelers (*Matter of McCoy* v. *Apgar*, 241 N. Y. 71). Many other instances of the enlargement of street uses or their restriction will readily suggest themselves. A wide gap intervenes between the power of a municipality to determine the extent to which others may do business in its streets, and the power, hitherto ungranted to do business for itself.

" (c) The subdivision which we have designated (5) does not call for extended comment. There was no thought in enacting it that it would be made to bear the burden of a system of transportation, to be paid for with public moneys and maintained by public officers. These are not health laws within any fair interpretation. Again the argument is persuasive that implication so extensive is illegitimate when there was demand as well as opportunity for unequivocal expression.

" The Home Rule article of the Constitution and the statute passed under its authority have a field of operation, narrower than some of the friends of the principle of home rule would favor, but still significant and important. Innumerable matters of detail that affect the fortunes of municipalities — the salaries of officers, the cost of necessary improvements, the methods and agencies and instruments for the attainment of corporate ends — these things and many others may be regulated today by the municipalities themselves. We make no attempt to mark the limits with precision. That task is for the future."

As likewise was said in *City of New York* v. *Village of Lawrence* (225 App. Div. 1; affd., 250 N. Y. 429): " It clearly appears that the words ' property, affairs or government ' were intended to embrace merely matters of municipal administration. The essential sovereignty of the Legislature in all other respects was preserved."

Respondent also seeks comfort from the enactment by the Legislature of chapter 437 of the Laws of 1930, amending section 2 of chapter 379 of the Laws of 1929, authorizing the surrender by the Land Board to the city of New York of the interest of the State in certain lands on Ward's island, in relation to the type of bridge to be constructed. Assuming for the moment that

this act, if properly entitled, provides necessary authority, the act itself is unconstitutional in that it violates article 3, section 16, of the Constitution, which provides: " No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title."

As noted, the original act in question merely relates to an authorization to the Land Board to release and surrender to the city of New York a part of the premises known as Ward's island from a lease made therewith by the city of New York to the State of New York. This is perfectly clear from the act as passed in 1929, wherein it is entitled: " An act to authorize the Land Board to release and surrender to the city of New York a part of the premises, with structures thereon, demised by the lease of Ward's Island made by the city of New York to the State of New York."

By the amendment of 1930 the scope of the act was broadened so as to relate to the type of bridge to be constructed. But the aforesaid title would carry no intimation to any one that the act purported to grant authority to lay and collect tolls for the use of the bridge to be constructed. It would, therefore, violate the aforesaid provision of the Constitution, which is based upon the common sense principle applied to the title of a bill, namely, that if the average man, having read the title and then coming upon the provisions in the bill, would find that they take him by surprise, since he could not reasonably have anticipated them when he read the title, both the legislator and the citizen are misled by the title thereon. (*Economic P. & C. Co.* v. *City of Buffalo*, 195 N. Y. 286.) Judged by this test, clearly the enactment in 1929 related merely to the authorization to the Land Board to surrender a strip of land occupied by the State which the city could occupy by a portion of a bridge. No one contends that this title has any relation to the authority to levy tolls. In the same way, when this act was amended by chapter 437 of the Laws of 1930, the subject still related to the authorization to the Land Board to give permission to the city to erect a portion of its proposed bridge upon this strip of land. A fair reading of the title would seem to indicate that it related only to broadening the authorization given to the Land Board so that it might release the right of the State in this strip in order that the city might construct a definite physicial type of bridge. To attempt to stretch this language so as to authorize the city to levy tolls upon all those who use this portion of the public highway, would certainly seem to be introducing a totally new subject under language which ordinarily would only be read as relating to the type of bridge, fairly meaning the physical type of bridge, to be constructed, so that forsooth the

abutments might rest upon the strip in question. When we come to the body of the act in question, we still find that the authority attempted to be spelled out so as to afford the city the right to levy tolls is not clearly given. The subject really covered by the language is the permission given to the city of New York to construct and maintain on the strip of property released a bridge of a certain physical type, rather than a direct authorization to levy tolls upon the bridge. This appears from the language used, namely, " From and after the passage of this act, the city of New York may construct and maintain on the strip of property on Ward's Island described in section one of this act, a municipal toll bridge structure with piers and abutments."

If there is no right to levy tolls upon the Triborough bridge, then since the resolution of the board of estimate and apportionment and Local Laws 3 and 8 deal as a whole with the Triborough bridge and the vehicular tunnels, it would not be possible to save these acts as to the tunnel while declaring them unconstitutional as to the bridge. In addition, however, there is grave doubt whether the Legislature conferred authority to levy tolls upon the tunnels under another act passed in 1930, namely, chapter 373 of the Laws of 1930. The title of this act is: " An Act to amend the Public Service Commission Law, in relation to the powers and duties of the board of transportation."

It cannot be said that this title carries any fair intimation of the grant of a power to the city to impose tolls. A reading of the act also discloses no express grant of such power. The act is a general one and contains merely a general provision that any bonds issued by any city in connection with the construction of any tunnels " shall be payable at maturity out of a sinking fund to be established and created out of the rates and charges fixed by the said board of estimate and apportionment or other local authority in said city for the use of the said tunnel or tunnels by pedestrians and vehicles." It would seem that so general a provision could properly have application only to the particular cases where authority to charge tolls had already been duly given by the Legislature. As indicated above, however, since there is no valid authorization to levy tolls upon the bridge, and since the resolution of the board of estimate and apportionment and these local laws tie up together this bridge and the vehicular tunnels, if the right to levy tolls upon the bridge is without authority, it would carry with it the whole of the local laws in question. We thus are reluctantly brought to the conclusion that the Legislature has not granted to the city the right to levy tolls upon portions of the highways of the State represented by this proposed bridge and tunnels. Whether or not the Legislature

intended to grant to the city the right to lay tolls upon portions of the general highways, such authority has not yet been given.

There is also a practical consideration which warrants attention. The appropriation of $3,000,000 for the preliminary surveys and plans starts a project on the part of the city which, as estimated now, will amount to an expenditure by the city of approximately $200,000,000. Common experience would indicate that such expenditure may far exceed this amount before the improvement is completed. If there is doubt whether legislative authority may be given to the city to levy such tolls, is it not the part of wisdom to have the question of authority settled at the beginning of this expenditure rather than after this large amount of bonds has gone into the hands of innocent purchasers?

It follows that the complaint of the plaintiff states a good cause of action, and the order and judgment appealed from should be reversed, with costs, and judgment directed in favor of the plaintiff with costs.

DOWLING, P. J., concurs.

Judgment and order affirmed, with costs.